UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| MICHAEL W. BRIDGES, JR., | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:20-cv-00065 ) ) Judge Christopher H. Steger |
| CHATTEM CHEMICALS, INC. | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

**I.       Introduction**

This matter is before the Court following a five-day bench trial commencing February 15, 2022. Plaintiff Michael Bridges, Jr., alleged his former employer, Chattem Chemicals, Inc. ("Chattem"), terminated his employment in violation of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 ("TPPA"),[1] for refusing to remain silent about violations of Federal Drug Administration ("FDA") regulations pertaining to record-keeping with respect to the manufacture of a pharmaceutical drug or its ingredients. For reasons that follow, the Court finds that Chattem terminated Plaintiff's employment for reasons other than a refusal to remain silent about alleged violations of FDA regulations. Consequently, Plaintiff will not prevail in this action, and judgment will be entered in favor of Chattem.

**II.      Findings of Fact**

Having observed firsthand the testimony and evidence presented at trial, the Court makes the following findings of fact: Chattem manufactures pharmaceuticals and pharmaceutical

---

[1] This action was removed from the Hamilton County Circuit Court in Tennessee pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331. In his complaint which Chattem removed to this Court, Plaintiff brought a claim under the Family Medical Leave Act. This claim was dismissed at the summary judgment stage. This Court now exercises supplemental jurisdiction over the TPPA claim pursuant to 28 U.S.C. § 1367.

components at its plant in Chattanooga, Tennessee, including methamphetamine, fentanyl, and methenamine mandelate. Because of the nature of its products, Chattem is subject to FDA and DEA oversight and must follow all applicable regulations in the manufacture of pharmaceuticals and their components. Chattem is also required to possess a license from the FDA and the federal Drug Enforcement Agency. The employees who are hands-on in the manufacturing process—mixing ingredients and running the manufacturing machines—are called chemical operators ("operators"). The operators generally work in pairs. Because the manufacturing process can last for hours, it is not unusual for a shift change to occur during the course of the manufacture of a single batch of product. Plaintiff was a chemical operator at Chattem from September 2013 until his termination on March 19, 2019. Prior to his termination, Plaintiff had not been disciplined at Chattem.

The FDA promulgates regulations concerning the manufacture of pharmaceuticals and their ingredients. The FDA requires manufacturers to create, follow, and enforce internal regulations for manufacturing pharmaceuticals and their components, including keeping accurate records for each batch of product made. To this end, Chattem has developed and maintains a set of Standard Operating Procedures ("SOP"). Among other things, Chattem's SOP requires the operator actually engaged in the manufacturing process to make a notation of each step in the manufacturing process. This notation should include the time each step occurred as well as the operator's initials. As a general matter, these records—referred to as batch records—are checked by the second of the two operators to assure accuracy of content and adherence to the proper notation format. Minor notation errors and subsequent correction of those errors are not uncommon. An operator has a duty to bring concerns about incorrect batch records to management's attention. The FDA is authorized to investigate batch record inaccuracies.

The pharmaceutical products manufactured at Chattem required precision and attention to detail. The duties undertaken by the operators carried with them some risk and could be stressful at times. Disagreements and coarse language were not uncommon. The operators' supervisors worked in a building that was separate from the manufacturing building; however, they met with the operators each morning. During these morning meetings, supervisors provided instructions to the operators and the operators could bring their concerns to the supervisors. On occasion the supervisors used profanity when expressing frustration or discussing deficiencies with respect to the operators' work.

On Thursday, March 7, 2019, Operator Billy Brewton brought a set of batch records to Plaintiff. The records were for a batch of methenamine mandelate which Plaintiff had helped manufacture. Brewton told Plaintiff that the records were "f ***** up." Plaintiff examined the records and saw what he believed to be a number or errors in the form of the notations.[2] He also saw that Operator Gene Giles—who had assumed control over the manufacturing process for that batch after Plaintiff's shift ended—had made changes to Plaintiff's notations. Plaintiff believed that Giles' changes to the notations were incorrect, and that Giles had compounded the problem by not consulting Plaintiff before making those changes. Plaintiff believed that Giles' conduct constituted a violation of Chattem's SOP. One disputed notation involved a time entry for a step in the manufacturing process. This dispute centered on whether the time in the notation should be recorded to memorialize the commencement of the step or the completion of the step (which, in this case, would be a difference of several hours). Beyond the substantive change in the notation, Plaintiff believed that Giles' change to the notation violated Chattem's SOP because Giles had not

---

[2] There have been no allegations that there was anything wrong with the actual manner in which the methenamine mandelate was manufactured.

been personally involved in that particular step of the manufacturing process and, therefore, was not authorized to correct the notation.

As a result of the dispute between Plaintiff and Giles concerning the correction to a batch record notation, Plaintiff initiated a conversation that same day with his direct supervisor, Engineer Dan Weeks. Weeks testified at length during the trial about the operators' responsibilities and conduct generally. He also testified about his interactions with Plaintiff, and the discussions he had with his supervisors and other employees which ultimately led to Plaintiff's termination.

Weeks testified that, two to three times a week, operators came to him with questions about a potentially incorrect notation in a batch record. Weeks was happy to address those questions with the operators. What distinguished those routine supervisor-operator conversations from Weeks' March 7 conversation with Plaintiff was the level of anger expressed by Plaintiff during their meeting. When Plaintiff entered Weeks' office, he slammed down onto Weeks' desk a three-ring-binder containing the batch records. He called Gene Giles a "son-of a bitch," accused Giles of trying to get him fired, and stated that the changes Giles made were incorrect. Plaintiff's anger was directed at Gene Giles—not Weeks—but it was so intense that Weeks' attention was necessarily focused on managing Plaintiff's anger instead of focusing on the specific notations in the records. Eventually, Plaintiff "ran out of steam," and Weeks told him that he would talk with Giles and get back to him.

After Plaintiff left his office, Weeks went directly to the office of his supervisor, Engineering Manager Brad Parr. He closed and locked the door and told Parr, "We need to talk." Weeks told Parr that he had never seen anyone get so angry over a correction in a batch record, and he relayed to Parr the specifics of Plaintiff's comments and demeanor. He told Parr that although Plaintiff's anger had been directed at Giles, Plaintiff's conduct was such that Weeks felt

concerned for his own safety. The two men then examined the correction about which Plaintiff had complained. Weeks and Parr concluded that the correction Giles had made was actually proper. They also agreed that Weeks would talk to Giles to solicit his side of the story.

On March 12, 2019, Weeks discussed the disputed batch correction with Giles. He told Giles that the drama between him and Plaintiff needed to stop. Giles—who had been a lead operator for four years at that point—told Weeks that Plaintiff was the cause of the drama, and that Plaintiff's reaction in this situation was typical behavior on his part. Weeks relayed this information to his supervisor, Parr, who in turn determined that this situation needed to be brought to the attention of Chattem's General Manager, Jason Allen. Upon learning of the situation, Allen directed Weeks and Parr to interview other operators to determine if Plaintiff's angry outburst on March 7 was "a one-time event" or part of an ongoing pattern in his interactions with other operators.

On March 14, 2019, Weeks and Parr interviewed eight other operators individually. During the interviews, Weeks took notes and created a handwritten summary of the highlights of each operator's statements to him. The operators described Plaintiff as a person who was controlling; who constantly bullied and intimidated other operators; and who displayed a "his way or the highway" attitude. The details the operators shared with Weeks and Parr included such things as:

- Plaintiff "disrespected" everyone.

- Plaintiff was very territorial about areas of the plant and would tell other operators to "get the f*** out of here"—even the operators with whom he was supposed to be paired.

- Plaintiff would not take direction from lead operators above him.

- Plaintiff would get right in operators' faces, yelling, cursing and poking out his chest to use his large frame[3] to intimidate other operators.

- Plaintiff demeaned and insulted other operators in a very personal manner.

- Plaintiff once chased a smaller operator across the room and up the stairs to another floor of the building before another operator intervened to break it up.

- One operator asked to change shifts and another operator was looking for another job to get away from Plaintiff.

- Plaintiff took breaks much longer than his allotted break time and napped in his truck so much that other operators dubbed his truck "the Dodge Motel."

- Another operator told Weeks that Plaintiff had bragged to him that, in a previous job, he had slept with his supervisor's wife as revenge for something the supervisor had done, and that he had threatened to burn down his supervisor's house with his wife and child in it.

- An operator told Weeks that Plaintiff had disabled safety features on valves in the plant.

- On one occasion, while heating isopropyl alcohol, Plaintiff, left the plant to take a nap in his truck. As a result, the room filled with a toxic vapor which could have injured other operators or caused an explosion. Another operator ran inside and opened a roll-up door to ventilate the area.

- Operators stated that they had not reported Plaintiff because they did not want to be a "snitch" or cause trouble.

At trial, Chattem presented the testimony of three of the eight operators whom Weeks and Parr had interviewed on March 14, 2019. The operators' testimony concerning their experiences with Plaintiff was substantially consistent with Weeks' portrayal of the March 14, 2019 interviews with them. Weeks testified at trial that, while he knew there were some disagreements in the day-to-day working relationships among the operators, he was unaware of the extent and intensity of

---

[3] The Court took judicial notice that Plaintiff is over six feet tall and has a large frame. He was larger than the other operators and supervisors who testified at trial which provided some additional credence to co-workers' allegations they were intimidated by Plaintiff.

the problems between Plaintiff and the other operators until the March 14 interviews. And, until he interviewed the operators, he was not aware of the safety issues they raised.

At the trial, Plaintiff, for his part, denied that he bullied other operators; stated that he believed he had a good relationship with most of them; and represented that disagreements and posturing were just part of the widespread culture at Chattem that included everyone—even supervisors. He vehemently denied saying that, at a previous job, he had slept with his supervisor's wife as revenge for something the supervisor had done, or that he had threatened to burn down the supervisor's house with his wife and child in it. He admitted sleeping in his truck, but only during his allotted break times. He testified that operators sleeping during their breaks—especially on the night shift—was a commonplace occurrence.

Following their interviews with the operators on Thursday, March 14, Weeks and Parr spoke with Allen and summarized the content of their interviews. Weeks then attempted to initiate a meeting with Plaintiff to discuss with him the accusations his co-workers had made against him. Plaintiff, however, was absent the next two days—the first day to take his father to dialysis and the second day because his truck broke down on the way into work. On March 18, 2019, a number of Chattem management employees met in person to discuss Plaintiff's status. These employees included Dan Weeks, Brad Parr, Ed Rusk (Chattem's CFO and Director of Administration), and Jennifer Davis (Human Resources representative). Joining by telephone was Chattem's General Manager, Jason Allen, who could not attend in person because he was traveling on business. Weeks summarized the results of his investigation for the group. His summary expanded upon his notes which were somewhat skeletal in nature. After listening to Weeks' summary of the investigation, and discussing the situation with the team, Jason Allen ultimately made the decision to terminate

Plaintiff's employment; however, Allen characterized the termination decision as unanimous and indicated that, for that reason, he merely "blessed" the decision.

On Tuesday, March 19, 2019, Weeks, Parr, and Rusk met with Plaintiff. As indicated, the decision to terminate his employment had already been made at that point and a termination letter had been prepared. Plaintiff recorded the meeting. Weeks began the meeting by stating that, based on the manner in which Plaintiff had responded to Giles' corrections to the batch record, Chattem had conducted an investigation into how Plaintiff interacted with other chemical operators. Weeks continued that the investigation had uncovered "inappropriate actions" by Plaintiff involving angry conflicts with other operators. Weeks did not provide specific examples, but did tell Plaintiff that he wanted to give him an opportunity to speak. Plaintiff replied that he did not know what Weeks was talking about. Weeks then read from the termination letter which stated that Plaintiff was terminated for creating a hostile work environment and for disregarding safety and compliance regulations. The Court finds the testimony of Weeks, Parr, Rusk and Allen to be consistent with one another. The Court also finds them to be credible witnesses.

As evidence of pretext, Plaintiff points to other Chattem employees who were accused of misconduct, but were not terminated. More specifically, Plaintiff testified about two altercations between other chemical operators occurring in 2017. It is uncontroverted that Chattem investigated these altercations.

First, in February of 2017, an operator texted Mr. Weeks that a fellow operator, Mark Peters, had verbally berated him and had created a hostile work environment. The complainant also raised a concern that Peters might resort to physical violence. Weeks investigated this incident, starting with an interview of Peters. Weeks then interviewed several other operators who had witnessed the incident. Ultimately, Weeks concluded that the complaint was unfounded and

that Peters had not engaged in misconduct. During the investigation, the operator who reported the alleged verbal abuse voluntarily left Chattem for a position with another company.

Second, in October of 2017, Jason Allen; Brad Parr; and Raven Snyder, a Process Engineer, met to discuss an altercation in the workplace which had occurred between two Chattem operators, Mark Huskey and Billy Brewton. Chattem management interviewed both Huskey and Brewton. According to Huskey, he and Brewton began arguing with each other over who was responsible for an incident in which a third-party driver had backed a truck into a guardrail. The conversation became heated, and Huskey invited Brewton outside to fight. Once outside, Brewton told Huskey—whose mother had died recently—that Brewton was going to "put him where his momma is." When interviewed, Brewton stated that Huskey had started the verbal harassment and Brewton had simply reciprocated. Brewton admitted to making the threat to Huskey that he would "put him where his momma is." Ultimately, Huskey and Brewton did not get into a physical altercation. Rather, they went into the parking lot, argued for about ten minutes, and then returned to work. During the meeting with management to discuss the altercation, Brewton apologized for the "momma" remark. Jason Allen gave Brewton a verbal warning for threatening Mark Huskey, which warning was placed in Brewton's file. No other action was taken against Brewton.

Chattem has a progressive disciplinary policy which starts with a written reprimand and progresses up through termination. However, if the offense is serious enough, progressive discipline can be skipped and an employee with an otherwise clean record can be terminated immediately. Weeks testified that other employees had been fired for unacceptable conduct prior to Plaintiff's termination. By way of example, he testified that two operators on the night shift who had actually made beds for themselves in the plant were fired for sleeping on the job.[4] He also

---

[4] He also provided the contrasting example of an operator who inadvertently fell asleep while sitting in the break room. That employee was suspended for five days, but was not fired

cited the example of an office employee who was fired immediately after hitting another office employee.

**III.     Conclusions of Fact and Law**

The Tennessee Public Protection Act provides in relevant part that, "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b), *see also Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015). "Illegal activities" are defined as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety, or welfare." Tenn. Code Ann. § 50-1-304(a)(3)(A). The Court accepts that FDA regulations are regulations intended to "protect the public health, safety, or welfare."

The TPPA establishes the framework to be used in analyzing a TPPA claim:

> In any civil cause of action for retaliatory discharge brought pursuant to this section, or in any civil cause of action alleging retaliation for refusing to participate in or remain silent about illegal activities, the plaintiff shall have the burden of establishing a prima facie case of retaliatory discharge. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the plaintiff's discharge. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of discrimination raised by the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the plaintiff's discharge and that the stated reason was a pretext for unlawful retaliation. The foregoing allocations of burdens of proof shall apply at all stages of the proceedings, including motions for summary judgment. The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of unlawful retaliation.

Tenn. Code Ann. § 50-1-304(f); *see also Burns*, 465 S.W.3d at 111-113.

"The burden to establish a prima facie case [for a TPPA claim] is not onerous." *Williams v. City of Burns*, 465 S.W. 3d 96, 113 (Tenn. 2015). The plaintiff must present evidence to show:

(1)     the plaintiff was an employee of the defendant;

> (2) the plaintiff refused to participate in or remain silent about illegal activity;
> (3) the defendant employer discharged or terminated the plaintiff's employment; and
> (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Burns*, 465 S.W. 3d at 111 (citing *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 26-27 (Tenn. 2011)). In its Memorandum and Order denying Chattem's Motion for Summary Judgment, [Doc. 73, Memorandum and Order at 9-17], the Court addressed at length the evidence Plaintiff presented to establish a prima facie case and concluded that the Plaintiff had done so. Plaintiff presented this same evidence at trial, and the Court finds, again, that such evidence was sufficient to establish a prima facie case at trial.[5]

Having concluded that Plaintiff established a prima facie case, the Court moves to the next step in the analytical framework established by Tenn. Code Ann. § 50-1-304(f). In this next step, Chattem must present evidence of a legitimate, nondiscriminatory (non-retaliatory) reason for Plaintiff's termination. If Chattem is able to produce such evidence, the burden shifts to Plaintiff to prove that such reason is pretextual.

---

[5] One of the issues Chattem raised in the motion for summary judgment was that, as a matter of law, Plaintiff could not demonstrate that Chattem had violated any FDA regulations regarding record-keeping because there were no FDA regulations that pertained to the specific fact scenario presented in this case. Plaintiff responded that 21 C.F.R. § 211.188 applied. Chattem did not directly address in its reply brief whether § 211.188 applied, and the Court held that § 211.188 did apply. At trial and in their post-trial brief, Chattem argued for the first time that § 211.188 does not apply to Chattem because Chattem only makes *ingredients* for finished drug products—not the finished drug products themselves, and § 211.188 only applies to finished drug products. Arguably, Chattem waived this argument because it did not make the argument in its reply brief at the summary judgment stage of this case. *See Notredan, LLC v. Old Republic Exch. Facilitator Co.*, 531 F. App'x 567, 569 (6th Cir. 2013) (failure to address an argument in a motion to dismiss amounts to a forfeiture of the claim); *Wallace v. Hendersonville Hospital Corporation*, No. 3:14-cv-01976, 2016 WL 3568593, at *6 (M.D. Tenn., July 1, 2016) ("The plaintiff's failure to address either of these arguments in her response in opposition to the motion for summary judgment constitutes a waiver of any argument she might have.") (citation cleaned up). Nevertheless, the Court need not address this argument because there are other reasons why Plaintiff's TPPA claim fails, as will be discussed *infra*.

The Court finds that Chattem has presented evidence that Plaintiff was terminated for a reason other than his refusal to remain silent about an illegal activity. The Court further finds that Plaintiff has not carried his burden of proving that the **reason given by Chattem was not the true reason for Plaintiff's discharge and that the stated reason was a pretext for unlawful retaliation.**

More specifically, the Court finds that Chattem's management—Weeks, Parr, Rusk, Davis and Allen—decided to terminate Plaintiff's employment because they had an honest, good-faith belief, based on a reasonable investigation, that Plaintiff created a hostile work environment for other chemical operators at Chattem and that his actions created a safety hazard in the plant.[6] Chattem's investigation of Plaintiff was not commenced because Plaintiff reported what he believed to be inaccurate changes to notations in a batch record. Questions about batch notations were commonplace. Weeks encouraged operators to ask questions about batch records if they believed a notation was incorrect. The act of reporting a potential error in a batch record did not cause Plaintiff to be investigated.

Rather, the investigation arose as a result of Weeks' concern about the intense anger displayed by Plaintiff during the meeting in which he reported the potentially erroneous batch record. Witnessing Plaintiff's anger firsthand alarmed Weeks and led to the decision to interview Plaintiff's coworkers to determine whether Plaintiff's conduct and demeanor presented a problem in the workplace. Ultimately, the interviews conducted by Weeks and Parr of Plaintiff's coworkers revealed that they believed Plaintiff to be a relentless bully who created an intolerable work atmosphere in the plant for the operators with whom he worked; that he slept in his truck during

---

[6] "Where the employer can demonstrate an honest belief in its proffered reason, the inference of pretext is not warranted." *Weimer v. Honda of Am. Mfg., Inc.*, 356 F. App'x 812, 817–18 (6th Cir. 2009). "An employer has an "honest belief" in its reasons for discharging its employee when the employer reasonably relied on the particularized facts then before it and made a reasonably informed and considered decision before taking an adverse employment action." *Manstra v. Norfolk Southern Corp.*, No. 3:10-cv-1059950, at *15 (E.D. Tenn. March 28, 2021) (internal citations omitted; addressing, *inter alia*, a TPPA claim) , *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1988).

hours when he was supposed to be working; and that he created serious safety hazards at the Chattem facility. To be fair, there was evidence at trial that a certain level of coarseness and friction was normal and tolerated among the various operators who worked at Chattem; however, the investigation revealed a consensus among Plaintiff's coworkers that his uncooperative, difficult and aggressive behavior was more severe and pervasive than the normal day-to-day interactions among the operators, and that his conduct was an impediment to a safe, collegial, and cooperative workplace. After they concluded their investigation, Weeks and Parr summarized the information for Rusk, Davis, and Allen. Ultimately, Allen made the decision to terminate Plaintiff's employment for workplace misconduct, i.e., hostile environment and safety issues. Although Allen was the final decisionmaker, there was unanimous concurrence from the other Chattem management employees who participated in the investigation and discussions.

In an effort to establish pretext, Plaintiff has pointed to examples in which other operators got into heated arguments with one another, yet were not terminated. In one of those instances, an investigation revealed no wrongdoing. In the second example, an investigation revealed misconduct, but it was deemed to be an isolated event which did not create a lingering negative impact on coworkers. The Court finds that the examples of misconduct cited by Plaintiff were qualitatively less serious and quantitatively less pervasive than the examples of misconduct attributed to Plaintiff by his coworkers.

Chattem concluded that Plaintiff's pattern of misconduct was severe and pervasive enough to interfere with employee morale and create safety issues, and that the appropriate way to address the issue was to remove Plaintiff from the workplace. Consequently, Plaintiff's employment was terminated on March 19, 2019. The Court finds that Plaintiff was not terminated for refusing to remain silent about illegal activities. Rather, he was terminated for a legitimate, non-retaliatory

reason, and Plaintiff did not demonstrate at trial that Chattem's stated reasons for his termination were a pretext for unlawful retaliation.

## IV. Conclusion

Following a five-day bench trial in which the Court observed all of the testimony and evidence presented in this case, the Court concludes that Plaintiff has not proven by a preponderance of the evidence that Chattem terminated his employment for refusing to participate in, or remain silent about, illegal activities. Therefore, Plaintiff has not prevailed in his claim under the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304. Judgment will be entered in favor of Defendant Chattem.

**ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE